OWEN *v*. CENTRAL CLAY DRAINAGE DIST.

4-8996                                                   224 S. W. 2d 529

Opinion delivered November 28, 1949.

*L. V. Rhine* and *Carl L. Hunter,* for appellant.

*Verlin Upton* and *Charles Frierson,* for appellee.

GRIFFIN SMITH, C. J. Commissioners of Central Clay Drainage District petitioned for a levy of one percent against existing benefits, proceeds to be used for maintenance, including a Government-constructed levee. The County Court order of denial was responsive to protests by sixty-two landowners. When the Commissioners appealed, Circuit Court permitted withdrawal of remonstrances and substitution of a motion to dismiss. The motion, treated as a demurrer, was overruled.

*Background of the Controversy.*—Drainage District No. 8. of Clay County existed in a somewhat nebulous state when, by Special Act No. 317 of 1911, appellee, hereafter referred to as Central, was created. Expressed intention was that it should succeed District 8. Central, however, was designated a drainage *and levee* district. Section 32 of Act 317 deals with a main system of drains and levees ''for the protection of lands, taken as a

whole.'' Seemingly it was felt that before satisfactory results could be obtained a somewhat comprehensive levee and drainage system would have to be constructed. Responsive to this thought the right was given to create a subsidiary district, to be paid for from assessments made pursuant to authority conferred by § 6 of the Act.

By Act 149, approved March 11, 1913, overflow threats were to be met with a levee ''upon or near'' the east bank of Black River, the levee to run northward into Missouri to Giles' Bluff. The Commissioners were empowered to ''combine'' with individual land-owners or with authorities in Missouri, and were told that they might expend such sums as were necessary ''for the construction of said levee, and for maintenance thereof.''

The complaint here alleges that in 1938 the U. S. Government built slightly more than thirteen miles of levee ''along the Black River'' within Central territory. Central's Commissioners obligated the District to sup-ply right-of-ways, and to maintain the levee after con-struction had been finished. The cost was $125,000, all paid by the Federal Government; whereupon the Com-missioners gave evidence of the maintenance obligation by formal resolutions dated March 22, 1938.

It is shown by the complaint that bushes, small shrubs, and kindred growths, ought to be removed from the levee, requiring moderate annual expenditures; also that guards or patrols are needed during high water periods. By way of persuasion, Government engineers have disclosed a plan for extensive dredging of Cache River, the work to extend well into Clay County, and with obvious benefits to landowners in Central, where an estimated $220,000 would be spent.

Other allegations in the District's petition, which on demurrer must be taken as true, show large benefits from Government activities, and alternative damage to existing installations if the maintenance program should be defeated. When completed in 1919 the drainage sys-tem embraced 90,000 acres, with assessed benefits of $689,359. The original construction included a 25-mile

main ditch near the channel of Cache River. There are approximately 90 miles of laterals.

The last assessment was made in April, 1939. All bonds, with interest, have been paid, and the benefits have not been exhausted. Maintenance costs were met for all years through 1947, but funds are now lacking for upkeep, including the obligations assumed under the 1938 resolutions.

*Legal Points at Issue.*—Appellants expressly disclaim a purpose to question power of the Board to maintain the levee under its agreement with the Government, but insist that procedure must be according to Act 203 of 1927, Pope's Digest, §§ 4526-'27-'28, Ark. Stats., §§ 21-518-'19-'20. This would require the Commissioners to file plans relating to the additional undertaking, treating it as new construction. In that way assessment would await petitions showing approval by a majority in numbers, value, acreage, etc. See *Cox, et al.* v. *Drainage District No. 17 of Craighead County,* 208 Ark. 755, 187 S. W. 2d 887; *Indian Bayou Drainage District of Lonoke County* v. *Dickie,* 177 Ark. 728, 7 S. W. 2d 794. The cited decisions hold that residuary betterments are available for maintenance of original construction; but, conversely, if assessments on these betterments are for expansion or structural enlargements — building not contemplated when landowners participated in the proceeding or were given that right—then an apportunity for expressions is a prerequisite, and jurisdictional.

*The Demurrer, and Allegations of the Complaint.*— When complaint allegations are given their natural meaning, the District says its Commissioners allowed the levee to be built as an additional safety measure, securing existing drainage facilities; that the levee is a part of the terrain with which the District must deal at this time, and that irreparable injury will attend failure to maintain it as a necessary complement of the drainage system, procured without original cost.

When Central's predecessor (District No. 8) was taken over, levee construction was authorized. It was

emphasized two years later when the Commissioners were told that they might "combine" with others in procuring protection through levee construction along Black River. But we cannot, as appellee suggests, take judicial cognizance that the construction made in 1938, and the levee authorized in 1913, are in effect the same. While the purpose to protect lands was doubtless the same in each instance, identity of construction is lacking. It is appropriate—using that term in the sense of expediency—to consider what the General Assembly of 1913 contemplated when it implemented the parent Act of 1911. That intent, however, must appear from a definite subject matter, such as Chief Justice McCulloch spoke of in *Bonner* v. *Jackson,* 158 Ark. 526, at p. 531, 251 S. W. 1. It was proper, said he, for the Court to compare Acts 111 and 166 of 1923, "for the reason that they dealt with somewhat kindred subjects," each having to do with the legislative plan to create a Central Judicial District of Woodruff County.

Judge McCulloch also said in the Bonner-Jackson opinion that the Court would take judicial notice of "the map of the State" in verifying boundaries, where appropriate evidence supplied by the record leaves to the judicial authority the mere task of drawing conclusions from data not susceptible of successful contradiction. Applying this rule to the case at bar, we find sanction in Act 149 of 1913 of discretionary expenditures involving "such sums as may be necessary for the construction of said levee, and for the maintenance thereof."

This work, of course, was to be an original undertaking, and the legislative language, strictly interpreted, would restrict expenditures to "said" levee and its upkeep. Grant that the so-called Government levee, from a structural and protective standpoint, is materially different from the conceptions of Act 149, does it follow as a matter of law that when the Commissioners in 1938 agreed to the maintenance now complained of there was want of power or an abuse of discretion?

It is true that at the time the Government work was done the Commissioners were without express power to

build levees such as we have here as a supplemental undertaking or as an extension of drainage, without first procuring landowner consent. Records before the trial court are silent concerning any over-all plan of the Government in constructing the thirteen miles with which we are dealing and in exacting a Commission pledge of maintenance. The embankment may have been an engineering necessity in aid of navigation, contributing in some essential to broader Government plans. If rights of the District that the Commissioners could not alienate or impair were disregarded when entry was made and when upkeep was promised, the simple recourse to injunction afforded adequate protection to injured parties.

As the matter stood in February, 1949, when County Court was asked to charge betterments with a one percent annual levy, the structure was a topographic fact. It was just as much a part of the District as were its ditches and drains; and, according to admissions of the demurrer, maintenance is so integrated with upkeep problems as a whole that failure to preserve the levee would expose drainage to deterioration on a scale wholly disproportionate to the relatively small cost of the work proposed.

If it be a fact that there was no statutory authority for the contract made in 1938 *when* it was made, that is not true now; nor was it in February, 1949, when the petition was filed. By Act 213 of 1945, Ark. Stats., § 21-570, *et seq.*, drainage districts are permitted to construct, reconstruct, repair and replace levees, and to construct setbacks, etc. Section 2 of the Act authorizes such districts to "maintain and keep in proper repair any levee which may be constructed, reconstructed, repaired or replaced within said district by the Federal Government for the benefit of the land within said district, and to further obligate [itself] to keep its drainage ditches and their outlets free of obstructions." See, also, Act 124 of 1947, Ark. Stats., § 21-572.

In the instant appeal we find a district having within its area in 1949 a construction admittedly made in aid of drainage,—and supplied without cost to the landowners.

Whether the levee was legally put there in 1938 is not the issue here; nor do we suggest that it was illegally constructed. It is now an integral part of the drainage system, and maintenance is admittedly necessary.

Under the facts shown by this record, we hold that work the Commissioners propose to do falls under the provisions of § 4481 of Pope's Digest, Ark. Stats., § 21-533, as found by the trial Court.

The judgment of May 9, 1949, filed June 2d, is affirmed.